[No. S003169. Apr. 27, 1989.]

WILLIAM CONLEY HITCHCOCK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

692

COUNSEL

William Conley Hitchcock, in pro. per., and Jeffrey M. Howard for Petitioner.

Herbert M. Rosenthal, Diane C. Yu, Truitt A. Richey, Jr., Magdalene Y. O'Rourke and Dominique Snyder for Respondent.

OPINION

THE COURT.*—In this proceeding we consider a unanimous recommendation of the Review Department of the State Bar Court that petitioner, William Conley Hitchcock, be disbarred. Petitioner contends that (a) the review department violated his right to due process of the law by deleting seven findings of fact from the decision of the hearing panel, (b) the review department's recommendation is not supported by the evidence as a result of the deletion of these findings and (c) the recommendation of disbarment is excessive in light of substantial mitigating evidence.

Because the record amply supports the findings, which portray a clear pattern of serious misconduct, willful misappropriation of client funds in substantial amounts, willful engagement in the unauthorized practice of law while suspended for nonpayment of membership fees, failure to comply with the Rules of Professional Conduct upon entering into a business transaction with a client and failure to keep a client advised of proceedings in her case, we conclude that petitioner's contentions should be rejected, the review department's findings should be adopted and its recommended discipline imposed.

* Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kaufman, J., and Puglia (Robert K.), J.†

†Presiding Justice, Court of Appeal, Third Appellate District, assigned by the Chairperson of the Judicial Council.

## I.

The instant disciplinary proceeding consolidates seven separate matters, six of which are original client matters and the seventh a conviction referral. A notice to show cause was filed April 11, 1984, alleging misconduct relating to four of the original matters: (a) the Valley Oil and Gas matter, (b) the Herold matter, (c) the Mirzayan matter and (d) the Cieck matter.[1] After investigation of (e), the Kuhn matter, and (f), the unauthorized practice of law matter, the parties stipulated to waive issuance of notices to show cause, and these matters were also consolidated for hearing in this proceeding.

We referred petitioner's conviction of grand theft (Pen. Code, §§ 484-487) to the State Bar for hearing, report and recommendation as to discipline. Pursuant to joint motion for consolidation, this matter (the Prince Saud matter) was also consolidated in this proceeding.

After three days of hearings, the hearing panel filed its decision March 2, 1987. The panel's decision contained some 51 findings of fact, concluding with the recommendation that petitioner be suspended from practice for 5 years,[2] and be readmitted only after taking and passing the professional responsibility examination and demonstrating that he has continued to make restitution to those victims and clients who had not been fully reimbursed as of the hearing date.

The State Bar examiner requested review on the grounds that the panel's findings of fact were inconsistent with the evidence presented and that the language of the discipline recommendation was unclear and vague. The review department granted review.

Upon review, the review department's actions were unanimous: It adopted the panel's findings of fact and conclusions of law, deleted seven panel findings that dealt with mitigation and aggravation, made its own findings in mitigation and aggravation and recommended that petitioner be disbarred. This petition for review followed.

## II.

As in all attorney disciplinary matters, we independently examine the record, reweigh the evidence and pass on its sufficiency. (*Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 708 [224 Cal.Rptr. 738, 715 P.2d 699];

---

[1] The hearing panel dismissed the Cieck matter in its entirety. Accordingly, this matter is not addressed further.

[2] It is unclear whether the panel intended five years' actual suspension or some shorter period.

*Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186].) ■■■ In so doing, the findings of the State Bar are entitled to great weight and petitioner bears the burden of showing the evidence is so insufficient as to compel rejection of the bar's recommendation. (*Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 677 [244 Cal.Rptr. 462, 749 P.2d 1317].)

### A. *The Valley Oil and Gas Matter*

Approximately three months after retaining petitioner, Valley Oil and Gas (Valley) delivered to him a check in the amount of $205,000 made payable to petitioner's trust account. Petitioner was to maintain the funds in his trust account until Valley instructed him to disburse the funds to a third party.

Instead of depositing the funds in his trust account, however, petitioner negotiated the check for cash and used the funds to redeem from foreclosure real property located in Hawaii.[3] Subsequently, William Wrath, a Valley vice-president, telephoned petitioner's office daily over a three-week period to attempt to instruct him to transmit the $205,000 to a third party. At the end of this period, petitioner finally spoke with Wrath, telling him that the transmittal of funds was in process. At the time he made this statement, however, petitioner knew it was false because he had already misappropriated the funds. Petitioner testified that shortly after making this statement he informed Valley of his misappropriation and promised to repay the company in full.

Petitioner subsequently assigned to Valley his interest in an agreement for the sale of the Hawaii real property. Upon sale of the property, Valley received $163,000 towards repayment of the $205,000.

Petitioner later assigned to Valley a promissory note in the amount of $49,200. The note was dated September 1, 1981, and was taken by petitioner to secure a loan he had made to Arthur Evans and Evans and Evans, Inc. (the Evans note). The Evans note was payable on or before December 1, 1981. Although petitioner testified that he made this assignment to assure full repayment to Valley, the record shows that petitioner had previously assigned the same note to another client.[4] Neither assignee was aware of the

---

[3] Petitioner maintained throughout his hearing that all such acts of misappropriation were conducted in response to threats of violence against him and his family in the event he allowed the land to be sold in foreclosure. Because such threats of violence are considered mitigating factors, they are discussed in the mitigating evidence section. (*See post,* pp. 704-705.)

[4] Petitioner had previously assigned the Evans note to his client Willa Kuhn. Petitioner's misconduct while representing Ms. Kuhn is the subject of the Kuhn matter, discussed, *post,* at pages 699-701.

other until several months later. Subsequently, the Evans loan went into default, Evans and Evans, Inc., declared bankruptcy and Arthur Evans was murdered.

Valley filed a civil action against petitioner to collect on the Evans note. The matter was settled by stipulated judgment in Valley's favor in the amount of $63,060. The parties stipulated that Valley would not levy under its writ of execution so long as petitioner made specified monthly payments. At the time of the hearing, petitioner was making payments of $250 per month.

The hearing panel concluded that petitioner's conduct in this matter involved moral turpitude, dishonesty and corruption in violation of Business and Professions Code[5] section 6106[6] and Rules of Professional Conduct,[7] rule 8-101(A) and (B)(4).[8] Petitioner has not challenged these findings and we adopt them.

### B. *The Herold Matter*

Linda Herold (Herold) retained petitioner to represent her in the dissolution of her marriage. According to Herold, petitioner subsequently failed to inform her that the mandatory settlement conference was set for February 4, 1982. Following the conference, petitioner informed Herold that the conference had taken place and that he had appeared on her behalf. Upset that she had not been present, she asked petitioner why she had not been notified of the conference. Petitioner responded that the court had not notified him until the morning of the conference.

Petitioner also told Herold that her husband was not present and that the settlement agreed upon was very favorable to her. Petitioner represented that the settlement agreement provided that within 30 to 60 days she would receive between $20,000 and $30,000 as a personal property settlement, the community property liquor store would be put up for sale immediately and her husband would pay court costs and attorney fees.

---

[5] All further statutory references are to the Business and Professions Code unless otherwise indicated.

[6] Section 6106 provides in pertinent part that "[t]he commission of any act involving moral turpitude, dishonesty or corruption . . . constitutes a cause for disbarment or suspension."

[7] All rule references are to the Rules of Professional Conduct unless indicated otherwise.

[8] Rule 8-101(A) provides: "All funds received or held for the benefit of clients by a member of the State Bar . . . shall be deposited in one or more identifiable bank accounts labelled 'Trust Account' . . . or words of similar import . . . and no funds belonging to the member . . . shall be deposited therein or otherwise commingled therewith . . . ."

Rule 8-101(B)(4) requires a member of the State Bar to "[p]romptly pay or deliver to the client as requested by a client the funds . . . in the possession of the member of the State Bar which the client is entitled to receive."

Court records show that notice of the mandatory settlement conference was sent to petitioner almost four months prior to the conference. Further, the record indicates that the husband was present at the conference, that the liquor store would be sold and net proceeds equally divided, that there were no other community property assets or obligations and that each party would pay their respective court costs and attorney fees. There is no record of any personal property settlement. The stipulation and order filed on the day of the conference was not signed by Herold, but a notation indicated that she had consented to the terms of the agreement by telephone.

Petitioner's testimony as to the conference was somewhat inconsistent. On the one hand, he testified that his only notice of the conference occurred its very morning, at which time he received a call from the court informing him that his presence was required at the conference then in progress. On the other hand, petitioner testified that, prior to the conference date, Herold had indicated that she would not attend because she wanted to avoid a confrontation with her husband and otherwise had work obligations. Petitioner further testified that, prior to signing the stipulation, he telephoned Herold and obtained her consent to the terms of the agreement.

Petitioner, the husband and his attorney signed the stipulation on the date of the conference. Herold signed three weeks later. Herold testified that she had read the document and did not agree to its contents because of the absence of any provision for a personal property settlement, but that she signed the agreement because petitioner told her the judge had made separate arrangements for payment of the personal property settlement and that if she did not sign, payment of the money and sale of the liquor store would be delayed.

After 60 days had passed without her receiving the personal property settlement as petitioner had promised, Herold began to press petitioner for payment. In June of 1982, petitioner gave her a check in the amount of $7,000, which he represented as partial payment of the personal property settlement. Herold was twice unable to cash the check due to insufficient funds. Again, petitioner's testimony was inconsistent. He testified that he told Herold two days after making the $7,000 payment that it was actually a loan from him and not an advance against the property settlement.

The hearing panel found that (a) petitioner entered into the agreement at the settlement conference with Herold's authority and consent, (b) petitioner had Herold's authority and consent to appear at the settlement conference, (c) Herold voluntarily signed the necessary documents to confirm the agreement reached at the conference and (d) the $7,000 check was to have been a loan, but rather than tell Herold it was a loan, petitioner had instead

falsely represented to her that the check was partial payment of monies owed under the asserted settlement agreement. Accordingly, the panel concluded that petitioner violated section 6106 by making false representations to his client and violated rule 6-101(A)(2)[9] by failing to keep his client apprised of the proceedings in her case. Petitioner has not challenged these findings and we adopt them.

### C. *The Mirzayan Matter*

In the latter part of March of 1982, Yourik M. Mirzayan retained petitioner to represent him in a dispute involving real property. Petitioner negotiated a settlement of $14,500 for Mirzayan. On June 3, 1982, petitioner received $5,000 as final payment of the settlement amount. Petitioner subsequently issued a check to Mirzayan in the amount of $5,000 which proved to be nonnegotiable due to insufficient funds.

Despite Mirzayan's repeated requests for payment of the $5,000, petitioner either failed or refused to release the funds. At the hearing, however, Mirzayan testified on petitioner's behalf that petitioner had since made restitution in full in cash and services.

Petitioner has stipulated to these facts. The hearing panel concluded that petitioner had misappropriated funds belonging to his client in violation of rules 8-101(A) and 8-101(B)(4) and section 6106. Petitioner has not challenged these findings and we adopt them.

### D. *The Kuhn Matter*

In October 1981, petitioner represented to his client, Willa Kuhn, that he needed to borrow $45,000 from her for another client's use. Petitioner further represented to Kuhn that he would secure the loan by assigning her the Evans note. He executed the assignment in writing and subsequently sent Kuhn a photocopy, explaining that he would retain the original for safekeeping. Without informing Kuhn, petitioner subsequently assigned the Evans note to Valley. (See *ante*, pp. 696-697.)

Petitioner testified that he could not recall whether, prior to entering into the loan transaction with Kuhn, he had instructed her to obtain independent counsel to advise her about the transaction.

Failing to repay Kuhn after the Evans note had become due, petitioner repeatedly assured her the money would be forthcoming. On or about

---

[9]Rule 6-101(A)(2) provides that "[a] member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently."

December 21, 1981, petitioner gave Kuhn a check in the amount of $2,000 as payment for interest on the loan. The check was returned twice for insufficient funds. Petitioner subsequently gave her a check for $1,000 which she was able to cash.

In January 1982, petitioner told Kuhn that he had turned the Evans note over to another attorney for collection. In fact, the attorney to which petitioner referred, Jeffrey Howard, had been retained by Valley to collect on the Evans note after petitioner had assigned it to Valley. Howard was not aware that petitioner had also assigned the note to Kuhn until she telephoned him with this information. During this conversation, Howard informed Kuhn of petitioner's assignment of the Evans note to Valley and of the circumstances underlying that assignment.

In February 1982, petitioner told Kuhn that Howard had filed a suit against Evans and Evans, Inc., to collect on the note. He later showed Kuhn a copy of the complaint, telling her that, although the suit was filed in Valley's name, the claim nonetheless belonged to petitioner and Kuhn and that Howard, as a Valley employee, was required to file lawsuits in Valley's name.[10] Petitioner further told Kuhn that whatever money was recovered in the suit would be paid to her in satisfaction of his loan obligation to her. Two weeks later, petitioner told Kuhn that Evans and Evans, Inc., had defaulted in the suit, would pay the total judgment within ten days and had already paid $10,000 to Howard.

Later in the spring of 1982, petitioner paid Kuhn $600 in cash. At the time of hearing, petitioner had thus repaid only $1,600 of the $45,000 owed to Kuhn.

In late October of 1982, Kuhn filed a complaint against petitioner for damages for fraud and deceit, breach of fiduciary duty, breach of contract and money lent. The court determined that the assignment to Kuhn of the Evans note was fraudulent, malicious and oppressive and awarded judgment to Kuhn in excess of $114,000 in compensatory and punitive damages.

The hearing panel concluded that petitioner had entered into a business transaction with a client without first advising her to secure independent counsel in violation of rule 5-101,[11] that petitioner had misappropriated his

---

[10] Petitioner was aware that Howard was an independent solo practitioner retained by Valley specifically to recover Valley's funds misappropriated by petitioner.

[11] Rule 5-101 provides that "[a] member of the State Bar shall not enter into a business transaction with a client . . . unless (1) the transaction and terms . . . are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client . . . , (2) the

client's funds in violation of rule 8-101(A) and (B)(4) and section 6106, and had misrepresented facts to his client in violation of section 6106.[12] Petitioner has not challenged these findings and we adopt them.

### E. *The Unauthorized Practice of Law Matter*

Between June 27, 1983, and November 18, 1983, petitioner was suspended from the practice of law for nonpayment of his State Bar membership fee. Petitioner acknowledged that on two occasions during this period he engaged in the practice of law.

On October 11, 1983, petitioner wrote a cease and desist letter on behalf of his client, Sandra Garrett. On October 27, 1983, petitioner prepared, served and filed an answer to a complaint for unlawful detainer for his clients James and Lynne Tucker.

Accordingly, the bar concluded that petitioner willfully engaged in the unauthorized practice of law in violation of section 6125.[13] Petitioner has not challenged these findings[14] and we adopt them.

### F. *The Prince Saud Matter*

In June 1983, petitioner entered a plea of nolo contendere to charges of misdemeanor grand theft (Pen. Code, §§ 484-487). The conviction became final January 28, 1985. We placed petitioner on interim suspension by order filed February 21, 1985, effective March 22, 1985. We referred the matter to the State Bar for hearing, report and recommendation.

The bar based its findings of fact on the transcript of petitioner's preliminary hearing in the criminal matter. Apparently petitioner acted as a mid-

---

client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

[12] The panel further found that (a) petitioner had made false and fraudulent representations to Kuhn to induce the $45,000 loan, (b) petitioner had defaulted in Kuhn's suit resulting in a judgment of approximately $114,000, unpaid as of the hearing, entered against him and (c) the nature of the transaction rendered Kuhn eligible to recover from the State Bar Client Security Fund.

The review department unanimously struck these three findings (panel findings numbered 45, 46 and 47, respectively) without explanation.

[13] Section 6125 provides: "No person shall practice law in this State unless he is an active member of the State Bar."

[14] At oral argument, however, petitioner stated he had mailed to the bar the delinquent dues prior to writing the letter for Garrett and answering the complaint for the Tuckers and erroneously assumed that by so doing he was automatically reinstated. Such testimony is generally not considered by us without first having been subject to State Bar scrutiny. (*Rosenthal v. State Bar* (1987) 43 Cal.3d 612, 663 [238 Cal.Rptr. 377, 738 P.2d 723].) Accordingly, we will not consider petitioner's statements at this point in the proceedings.

dleman in locating a short-term lender for Turki Bensaud Alsaud (Prince Saud). Prince Saud subsequently obtained two loans totalling $30,000 from the parties introduced to him by petitioner. The loans, made in December 1981 and January 1982, were secured by a pledge of three automobiles whose combined value far exceeded $30,000. Both loans were to be repaid at the end of January 1982 in the amount of $47,000.

Between January 18 and 22, 1982, Prince Saud and petitioner tried unsuccessfully to contact the lenders to arrange repayment of the loan and return of the automobiles. Toward this end, petitioner suggested that Prince Saud provide him with a cashier's check in the amount of $47,000 to allow him to attend personally to the repayment of the loan and reclamation of the cars. Prince Saud subsequently obtained and tendered to petitioner a $47,000 cashier's check payable to him.

That evening, petitioner notified a member of Prince Saud's staff that his efforts to contact the lenders were unsuccessful. Petitioner was instructed to continue with his efforts. Several days later, petitioner told Prince Saud that the lenders had refused to accept the money because it was not cash.

Petitioner subsequently delivered a letter to Prince Saud in which the lenders stated that if Prince Saud refused to pay $70,000 by noon the following day, then the prince would lose his automobiles. In response, on February 2, 1982, Prince Saud filed an action against the lenders. Petitioner declined to prosecute the case personally and indicated instead that he would have another attorney, one McMahon, handle the case. Petitioner refused, however, to allow Prince Saud or his staff to contact McMahon directly.

Around this time, petitioner told the prince's staff that he would deposit the $47,000 in his trust account. Petitioner further represented that the marshal had seized the prince's cars to hold for determination of the action against the lenders. In early March 1982, members of the prince's staff were unable to reach petitioner on the telephone and on March 9, they went to petitioner's office to demand return of the $47,000. At this time, petitioner told the staff that the marshal was in possession of the $47,000 and that it would be unwise to withdraw the money a day before the hearing.

Prince Saud had also retained an attorney, Maurice Sparks, to investigate petitioner's handling of the loan repayment. Sparks met with petitioner at the prince's home on March 8, 1982, and demanded petitioner return the $47,000 forthwith. Petitioner told Sparks that the money was in an interest-bearing account and that he would give it to Sparks for the prince on March 10, 1982, at the court hearing of the action against the lenders.

When Sparks met petitioner at the court on March 10, petitioner told him that he did not have the money and asked Sparks to accompany him to his office, where he would arrange for the money to be transferred. Sparks went to petitioner's office, where petitioner told him that he had placed a call to his broker and that the money would be transferred to a Newport Beach bank within two hours. The bank never received the funds.

Sparks's further attempts to meet with petitioner were unsuccessful. Consequently, on March 22, 1982, Sparks filed a complaint against petitioner to recover the money.

At the preliminary hearing, Prince Saud's lenders testified under grants of immunity that they took the three cars as collateral on $30,000 in loans to Prince Saud, they were to receive $47,000 in repayment and, because repayment was never made, they subsequently sold the cars.

The judge found that petitioner had initially tried to tender the payment to the lenders, but, failing in his efforts, petitioner subsequently spent the money.

At the State Bar hearing, petitioner offered a different version of the facts. Specifically, petitioner averred that two days after receiving the $47,000, and unsuccessful in his efforts to tender payment to the lenders, he went to Prince Saud's home to return the money. Petitioner alleged that he was instructed by a member of the prince's staff to use the money to protect the prince's interests.

To this end, petitioner asserted that he used a portion of the $47,000 to remove a mechanic's lien on the prince's house and a portion to settle a lawsuit against the prince. Petitioner claimed that he could thus account for $32,000 spent on the prince's behalf, having misappropriated a total of $15,000 from the prince. Petitioner failed, however, to offer any evidence to corroborate his testimony.

The hearing panel found that petitioner, as Prince Saud's attorney, had come into possession of $47,000 belonging to the prince, had used $32,000 to effect settlements on the prince's behalf, had misappropriated $15,000[15] owed to the prince, had willfully misrepresented to the prince and his agents facts relating to petitioner's disposition of the funds and had been convicted of a misdemeanor crime involving moral turpitude. The panel thus concluded that petitioner misappropriated client funds in violation of rule 8-101(A)

---

[15] It should be noted the record shows the terms of petitioner's plea bargain were uncertain as to the exact amount of restitution because of petitioner's failure to provide documents that he had asserted would substantiate his claim of having used $32,000 in the prince's behalf.

and (B)(4) and section 6106 and misrepresented facts to other attorneys in violation of section 6106. Petitioner has not challenged these findings and, although we are not certain of the precise amount of the prince's funds petitioner had actually misappropriated, we adopt them.

### G. *Mitigating Evidence*

Petitioner maintained throughout the proceedings that all his acts of misappropriation arose from his need for substantial sums of money to avert threats of violence made against him and his family. Petitioner asserts that, shortly after law school and before he was admitted to practice, he met a purportedly wealthy individual in the process of marital dissolution. Seeking to hide funds from his wife, the husband asked petitioner if he would be willing to purchase land in Hawaii in petitioner's name with funds provided by the husband. According to petitioner's testimony, he initially declined the husband's offer and suggested that the husband contact him after he was admitted to the bar.

Subsequently, the husband offered to pay petitioner 25 percent of the value of the land if petitioner would buy the land and hold it in his name until the divorce was final. Although petitioner says he did not want to hide assets from the wife, he nonetheless agreed to the scheme on condition the husband let him handle the property settlement as well. Petitioner apparently formed this agreement approximately six months before being admitted to practice in July 1977.

According to his testimony, petitioner thus became an unwitting agent of principals "who turned out to be connected either to drugs or to organized crime." Petitioner was to use the principals' funds to purchase land in his name and hold the property for instructions from them. The principals were to provide petitioner with funds to meet the monthly payments on the land.

This arrangement continued for approximately four years until the principals disappeared, leaving petitioner to make the monthly payments. Unable to locate the principals and without sufficient funds, petitioner defaulted on the land payments and allowed the property to proceed to foreclosure. At that time, petitioner began to receive threats of violence against him and his family, should he allow the Hawaii land to be sold in foreclosure.

Petitioner testified that he subsequently obtained a bank loan of $25,000 in March 1981 which he used to redeem the land. Petitioner's testimony indicates the demands for money and threats continued over a substantial period of time. Petitioner apparently met the demands by using the funds

obtained from his acts of misappropriation. Eventually, however, petitioner allowed the land to be sold in foreclosure. The record does not indicate that any threats of harm were ever carried out or that petitioner ever notified the police[16] or made any efforts to extricate himself from the land deal.

The hearing panel found that petitioner took the threats of violence seriously and determined that the threats were his sole motivation for misappropriating client funds. The panel concluded that, although petitioner's multiple acts of misappropriation would ordinarily result in a recommendation of disbarment without further discussion, because he took these threats seriously a lesser sanction was warranted.[17] Thus, the panel recommended that petitioner be suspended for five years.

The review department determined, however, that "the seriousness of [petitioner's] multiple offenses is not outweighed by mitigating circumstances to warrant discipline less than disbarment." Petitioner challenges the findings of the review department.

■ We conclude the review department's factual findings do not differ in substance from the panel's findings. On the contrary, it is the review department's conclusions of law, based on the facts adduced by the hearing panel, which differ from the panel's legal conclusions. Accordingly, we hold the factual findings of the review department are based on clear and convincing evidence[18] and adopt them.

---

[16] At oral argument, petitioner stated that he had notified the police but that, since he had done so after being convicted of grand theft, the police discounted his report.

[17] Under the heading "Evidence of Mitigation," the hearing panel listed three findings: "[¶] 48. Essentially, [petitioner], on four separate occasions in 1981 and 1982, willfully misappropriated monies from his clients ($64,000.00 from Valley Oil and Gas, Inc., $5,000.00 from Mr. Mirzayan, $15,000.00 from Prince [Saud], and $45,000.00 from Willa Kuhn). Ordinarily, this pattern of conduct would result in a recommendation of disbarment without further discussion. [¶] 49. However, [petitioner] proved by clear and convincing evidence that the monies he misappropriated were used to support a land transaction he had entered into in Hawaii. Specifically, [two individuals who petitioner] believes had underworld ties[ ] repeatedly threatened the lives of [petitioner, petitioner's] wife and his child. It was only these direct threats to the well being of [petitioner] and his family which caused him to juggle these funds between and among accounts. This evidence was uncontroverted. [¶] 50. This panel's assessment of [petitioner] was that he was deeply concerned with these threats, which he took seriously, and this was the sole motivating reason for his misappropriation of funds and misrepresentations to his client concerning these monies."

As "Evidence of Aggravation," the panel found: "[¶] 51. [Petitioner] has not been previously disciplined. No evidence of aggravation was discussed or argued at the hearings."

The review department struck these findings and those previously noted (*ante*, fn. 12), and substituted its own findings: "[¶] 45. In aggravation, [petitioner] committed four willful misappropriations of substantial amounts of money. [¶] 46. In mitigation, evidence of threats of extortion did not rise to the level justifying [petitioner's] misconduct. [Petitioner] has made some restitution in an unknown amount."

[18] The only factual finding the review department eliminated concerned the precise amount of funds petitioner misappropriated. The record is clear that, contrary to the panel's state-

We turn now to petitioner's challenges to the review department's recommendations, and discuss the disciplinary sanction appropriate to the facts of this case.

## III.

■ Petitioner contends that the review department violated his right to due process of law by deleting seven findings of the hearing panel without engaging in a full evidentiary hearing. This contention is meritless. As already observed, the review department's factual findings are not different in substance from the factual findings of the hearing panel.

Petitioner's "only due process entitlement is a 'fair hearing.' " (*Rosenthal* v. *State Bar, supra*, 43 Cal.3d at p. 634; *Coppock* v. *State Bar, supra*, 44 Cal.3d at p. 676.) Petitioner raises no issues of impropriety or unfairness as to the proceedings, findings or conclusions of the hearing panel. Indeed, over three days petitioner was allowed to present his own evidence, cross-examine State Bar witnesses and proffer arguments on his behalf. Therefore, we hold that petitioner's due process entitlement to a fair hearing was fully realized.

Citing *Inniss* v. *State Bar* (1978) 20 Cal.3d 552 [143 Cal.Rptr. 408, 573 P.2d 852], petitioner next contends that he should be relieved of the effect of any and all stipulations he made prior to his hearing. In *Inniss*, however, we held that when we consider disciplinary sanctions more severe than those recommended by the State Bar Court, fundamental fairness requires us to relieve an attorney from any *legal conclusions* to which he stipulated in State Bar proceedings. (*Id.*, at p. 555.) In this case, petitioner's stipulations were limited to the Valley and Mirzayan matters. The findings deleted by the review department do not relate to these matters. (See *ante*, fns. 12, 17.)

In any event, the only legal conclusions to which petitioner stipulated— that he willfully misappropriated monies from his clients—were conclusively supported by the facts to which he stipulated. Since stipulations regarding facts remain unaffected by the Inniss rule, even if petitioner were relieved from the stipulation that he willfully misappropriated client funds, we could not reasonably conclude otherwise.

Petitioner's stipulation to waive issuance of the notices to show cause did not affect his hearing as to the Kuhn and unauthorized practice of law matters. Even if, as petitioner contends, the hearing conducted by the re-

---

ment, petitioner misappropriated $205,000 from Valley and some undetermined amount from Prince Saud. Accordingly, the review department correctly eliminated the panel's erroneous figures from its findings of fact.

view department was summary in nature, petitioner nonetheless received a "fair hearing" in the hearing panel's proceedings as to all matters consolidated in this disciplinary proceeding. Thus, we hold petitioner suffered no deprivation of due process.

■ Petitioner further contends that the review department's deletion of seven hearing panel findings somehow renders the review department's substitute findings unsupported by the evidence. Therefore, petitioner concludes, the review department's disbarment recommendation is legally erroneous. Petitioner apparently fails to distinguish between findings of fact and legal conclusions drawn therefrom. As previously noted, the review department based the legal conclusions it substituted for the panel's conclusions, including those relating to the mitigating effect of certain facts, on panel factual findings petitioner has not challenged. Petitioner's disagreement with the review department's legal conclusions does not render them legally erroneous.

Having considered the matter closely, we conclude the review department's findings are fully supported by overwhelming evidence and its conclusions of law are sound. ■ We turn to petitioner's contention that the discipline of disbarment recommended by the State Bar is excessive.

■ " ' "The purpose of a disciplinary proceeding is not punitive but to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." ' " (*Chasteen v. State Bar* (1985) 40 Cal.3d 586, 591 [220 Cal.Rptr. 842, 709 P.2d 861].) ■ The discipline in each case must be determined by the particular facts and circumstances of the case. (*Ibid.*)

" 'Although the State Bar's recommendation as to discipline is entitled to great weight . . . we exercise our independent judgment in determining the appropriate punishment for professional misconduct . . . .' " (*Chefsky v. State Bar* (1984) 36 Cal.3d 116, 132 [202 Cal.Rptr. 349, 680 P.2d 82].) "Our principal concern is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standard for attorneys.' " (*Ibid.*) Petitioner bears the burden of demonstrating that, with due consideration to these objectives, the recommendation of the State Bar is erroneous. (*McMorris v. State Bar* (1983) 35 Cal.3d 77, 84 [196 Cal.Rptr. 841, 672 P.2d 431].) ■ We conclude petitioner has not met this burden.

As the hearing panel noted, a pattern of misconduct consisting of multiple instances of misappropriation of client funds would ordinarily "result in a recommendation of disbarment without further discussion." Indeed,

"[m]isappropriation of client trust funds has long been viewed as a particularly serious ethical violation. [Citations.] It breaches the high duty of loyalty owed to the client, violates basic notions of honesty, and endangers public confidence in the profession. [Citations.] . . . [M]isappropriation generally warrants disbarment unless 'clearly extenuating circumstances' are present. [Citation.]" (*Kelly* v. *State Bar* (1988) 45 Cal.3d 649, 656 [247 Cal.Rptr. 608, 754 P.2d 1104].) ■ Although we are not bound by the Standards for Attorney Sanctions for Professional Misconduct,[19] we give them great weight. (*Segal* v. *State Bar* (1988) 44 Cal.3d 1077, 1087 [245 Cal.Rptr. 404, 751 P.2d 463].) Standard 2.2(a) provides that "wilful misappropriation of entrusted funds . . . *shall* result in disbarment. Only if the amount of funds . . . misappropriated is insignificantly small or if the most compelling mitigating circumstances clearly predominate, shall disbarment not be imposed." (Italics added.) ■ We have previously noted the significant amount of funds petitioner misappropriated; thus it remains to determine if the mitigating circumstances are so compelling as to warrant a sanction less severe than disbarment.

■ Petitioner contends that significant mitigating factors are present in his case. He first points to the absence of any prior record of discipline. While this is significant where an attorney has practiced for a substantial period, we are less moved when an attorney has practiced for only a short time. (*Kelly* v. *State Bar, supra,* 45 Cal.3d at 658 [seven and one-half years without prior discipline insufficient to be considered a mitigating factor].) In this case, petitioner had been in practice for only four years before committing his first act of misappropriation. Furthermore, the record indicates that even before being admitted to practice he agreed to participate in a scheme to hide the assets of one party to a divorce proceeding from the other, itself an act subject to severe discipline. (See *Coppock* v. *State Bar, supra,* 44 Cal.3d at pp. 678-679; *Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 689 [238 Cal.Rptr. 774, 739 P.2d 134].) Thus petitioner's lack of prior disciplinary record is not a significant mitigating factor.

■ Petitioner next argues that his restoration of a substantial amount to Valley before the notice to show cause issued and his record of payment of restitution to Kuhn, Mirzayan and Prince Saud are significant mitigating factors. While voluntary restitution is always commendable, we cannot conclude that petitioner's restitutionary efforts are compelling mitigating evidence. The record indicates petitioner paid $163,000 to Valley from the proceeds of the sale of the Hawaii property which was originally purchased with funds supplied by an individual purportedly involved in organized

---

[19] All further references to standards are to the Rules of Procedure of the State Bar, division V, Standards for Attorney Sanctions for Professional Misconduct.

crime. So far as the record shows, however, these funds paid to Valley may be subject to a claim for resulting or constructive trust by this person or his former wife. Thus, the funds paid to Valley may well be just another instance of petitioner's shifting one client's funds to another client. Moreover, the payment of restitution to Ms. Kuhn and Prince Saud are the subject of court orders following civil and criminal actions, respectively. Restitution paid under the threat or force of disciplinary, civil or criminal proceedings is not properly considered to have any mitigating effect. (See *In re Nevill* (1985) 39 Cal.3d 729, 737, fn. 8 [217 Cal.Rptr. 841, 704 P.2d 1332]; std. 1.2(e)(vii).) Accordingly, petitioner's payment to client Mirzayan of restitution in some combination of money and services is the only act of restitution having any substantial mitigating effect.

■ Petitioner points to the panel's conclusion that his acts of misappropriation were committed only in response to threats of violence against him and his family and urges that we should consider this to be a significant mitigating factor. Duress which causes an attorney to commit acts of misconduct can be considered mitigating. (See *Montag* v. *State Bar* (1982) 32 Cal.3d 721, 726 [186 Cal.Rptr. 894, 652 P.2d 1370].) However, we are unable to treat the duress shown here as warranting discipline less than disbarment. First, the record does not demonstrate that the individuals whom petitioner fears have no interest in recovering the proceeds from the sale of the Hawaii land. Petitioner has not shown that he is no longer vulnerable to renewed threats, or that the possibility of renewed threats no longer exists, or that he has even taken appropriate action so that, if need be, future threats will be resolved in a responsible, legal and ethical manner. Consequently, the public would remain at risk if we were to allow petitioner to control client trust funds in the absence of a showing that he is no longer a likely target to the extortion he so greatly fears.

Second, and perhaps more important, we cannot condone the deliberate misappropriation of clients' funds because of threats to the attorney or his family from third persons. Misappropriation of a client's funds simply cannot be excused or substantially mitigated because of an attorney's needs, no matter how compelling.

■ Petitioner also urges we must consider as mitigating the fact that all acts of misconduct were confined to a relatively short and specific period of less than two years, and that his conduct prior to and since this period has been beyond reproach. Leniency may be warranted where it appears that an attorney's misconduct is an aberrant episode, or where the misconduct is attributable to a specific cause which is itself no longer operative. (See *Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1365-1367 [240 Cal.Rptr. 848, 743 P.2d 908].) However, as we have noted, in this case petitioner's

multiple acts of misappropriation were not isolated incidents. Further, there is no showing that the source of petitioner's fear giving rise to his misconduct, although apparently dormant, no longer exists.

 We do note in mitigation that petitioner has been involved in service to the community by participating in various American Bar Association activities, that petitioner has cooperated fully with the State Bar in the disciplinary proceeding against him, and that former clients and his current employer have attested to his ability to conduct himself with honesty and integrity since committing the subject acts of misconduct.

On the other hand, we note a number of aggravating factors: petitioner's misconduct evidences multiple acts of wrongdoing and demonstrates a pattern of misconduct; petitioner's misconduct was surrounded by or followed by dishonesty and concealment; and petitioner's misappropriations significantly harmed several clients. (See std. 1.2(b)(ii)-(iv).)

On balance, we conclude the mitigating factors do not rise to a level sufficiently compelling to warrant imposition of sanctions less severe than disbarment. Accordingly, we order that petitioner be disbarred from the practice of law and that his name be stricken from the roll of attorneys. We further order petitioner to comply with rule 955[20] of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon finality of this decision in this court.

---

[20] The willful failure to comply with rule 955 of the California Rules of Court "constitutes a crime punishable by imprisonment. . . ." (§ 6126, subd. (c).)