[No. S007598. Oct. 5, 1989.]

KEVIN CHASE COOMBS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Gert K. Hirschberg for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

**OPINION**

**THE COURT.**—In this proceeding we review the unanimous recommendation of the Review Department of the State Bar Court that petitioner Kevin Chase Coombs be disbarred. After considering the record and petitioner's objections, we adopt the review department's findings and recommendation and order petitioner disbarred.

I.

Petitioner was admitted to the practice of law in this state on May 29, 1981. He practiced with another attorney in Los Angeles until December 1981. Thereafter, petitioner entered into an association with a small law

firm in Culver City. In July 1982, he terminated his association with the firm. Petitioner moved out of the firm's offices in December 1983, and opened his own law office which he maintained until his involuntary enrollment as an inactive member of the bar in January 1987. He has no prior record of discipline.

In a notice to show cause issued on April 7, 1987, the State Bar charged petitioner with misconduct in 14 counts involving 14 different clients. Consolidated therewith was a separate conviction referral arising out of petitioner's conviction for driving under the influence. (Veh. Code, § 23152, subd. (a).) After 10 days of hearings, the hearing panel found petitioner to be culpable in 13 of the 14 counts,[1] for acts of misconduct which included: (1) abandonment of clients, (2) failure to return client files, (3) false representations that services for which he had been retained had been performed, (4) failure to provide an accounting of fees, and (5) failure to return unearned fees. The panel further found that the facts and circumstances of petitioner's conviction involved moral turpitude and other misconduct warranting discipline. The panel's decision contained some two hundred and three findings of fact and concluded with the recommendation that petitioner be suspended from practice for five years, stayed on conditions of probation including three years' actual suspension. The review department unanimously adopted the hearing panel's extensive findings of fact, but deleted three findings that dealt with mitigation, and unanimously recommended that petitioner be disbarred.

## II.

Petitioner does not challenge the State Bar's findings in the 13 client matters or the criminal conviction in which he was found to be culpable. The findings in these matters are summarized below.

### 1. *The Katus Matter*

In July 1985, Marilyn Katus retained petitioner to represent her in a dissolution of marriage proceeding. At petitioner's request, Katus paid $125 as an advance on attorney fees and an additional $125 as an advance for costs. Petitioner prepared the pleadings relevant to Katus's case and had her sign them. Between September 1985 and March 1986, Katus made a number of calls to petitioner's office to determine the status of her case. All of the calls went unanswered. In April 1986, Katus met with petitioner, who informed her that the papers in her case had been filed. In fact,

---

[1] A finding of nonculpability was made on count XIII, the Zolin matter. The complaining witness did not appear at the hearing in that matter.

petitioner had not filed anything in connection with the case. Katus later made approximately 30 calls to petitioner's office to determine the status of her case. On each occasion she was unable to speak with petitioner but left messages for him to return her calls. He failed to do so. Ultimately, Katus retained the services of another attorney to handle the dissolution. Petitioner never returned any portion of the $250 advanced by Katus for fees and costs.

The State Bar Court concluded that by his conduct in the Katus matter, petitioner wilfully violated sections 6068,[2] 6103,[3] and 6106[4] of the Business and Professions Code,[5] and rules 2-111(A)(3)[6] and 6-101(A)(2)[7] of the then existing Rules of Professional Conduct.[8] The hearing panel further found that petitioner's misrepresentation to Katus that the pleading had been filed constituted an act of moral turpitude.

### 2. *The Sieg Matter*

In July 1985, Helga Sieg retained petitioner to handle a landlord/tenant dispute on behalf of herself and her corporation. Sieg was an officer and shareholder in a closely held corporation which operated a restaurant on leased property. The restaurant operated from May 1984 until June 1985, at which time it ceased doing business. The corporation had fallen behind in the rent and received in July 1985 a notice of belief of abandonment from the landlord.

---

[2] Section 6068, subdivision (m) provides that it is the duty of an attorney to "respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services."

[3] Section 6103 provides: "A wilful disobedience or violation of an order of the court requiring him to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

[4] Section 6106 provides: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension. [¶] If the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding is not a condition precedent to disbarment or suspension from practice therefor."

[5] All statutory references are to the Business and Professions Code unless otherwise indicated.

[6] Rule 2-111(A)(3) provided that "[a] member of the State Bar who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned . . . ."

[7] Rule 6-101(A)(2) provided that "[a] member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently."

[8] New Rules of Professional Conduct became operative on May 27, 1989. All further rule references are to the previous Rules of Professional Conduct unless otherwise specified.

Sieg retained petitioner to preserve the lease. Though petitioner informed her that he responded to the notice, the hearing panel found that petitioner created the response after the fact to make it appear that he had responded. In August, Sieg informed petitioner that the landlord had changed the locks on the premises. Petitioner told Sieg that she was entitled to possession and requested that she come to his office. Thereafter, however, petitioner refused to make an appointment or to return her phone calls. Through August and September 1985, petitioner failed to respond to Sieg's several inquiries concerning the status of her case and her request for all documents pertaining to the matter.

In September, Sieg and the corporation filed for bankruptcy. Sieg retained a different attorney, Anna Segura, to handle the bankruptcy proceeding. Through February and March of 1986, petitioner failed to respond to Segura's numerous attempts to obtain Sieg's case file. Finally, in an effort to obtain the file, Segura had a subpoena duces tecum issued for petitioner's deposition. Petitioner failed to appear for the deposition and failed to respond to a subsequent written request for the file. In May 1986, the bankruptcy court, at Segura's request, issued an order to show cause why petitioner should not be held in contempt for his failure to appear at the deposition. On the recommendation of the bankruptcy court, the United States District Court in September 1986 adjudged petitioner to be in contempt and issued a warrant for his arrest. In October, the bankruptcy court awarded fees and costs against petitioner for his failure to obey the subpoena. (The State Bar Court found that petitioner had wilfully failed to pay said fees and costs.) The following month, petitioner was arrested pursuant to the warrant. Shortly after his arrest, petitioner delivered the file to Segura.

By his conduct in the Sieg matter, the State Bar Court found that petitioner had wilfully violated rules 2-111(A)(2)[9] and 6-101(A)(2) and sections 6068 and 6103.

### 3. *The Durham Matter*

In September 1985, Andrew Durham retained petitioner to represent him in municipal court against a criminal charge of driving under the influence. Durham paid petitioner $800 in advance to represent him in the matter.

---

[9] Rule 2-111(A)(2) prevented an attorney from withdrawing "from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules."

Petitioner appeared on Durham's behalf at the arraignment and the matter was set for an October pretrial hearing. Petitioner advised Durham that his presence would not be required at the hearing. Petitioner failed to appear at the pretrial hearing, however, and a bench warrant was issued for Durham's arrest. After he received a copy of the bench warrant, Durham contacted petitioner. Petitioner told him that the warrant must have been erroneously issued, as he was in court on the date in question, and assured him that he would take care of it. (The State Bar Court found that petitioner's response constituted a wilful misrepresentation, as he knew the warrant had been issued because of his failure to appear.)

After he received a second notice of the outstanding bench warrant, Durham attempted to contact petitioner but was unable to do so. As a result, Durham appeared in court by himself, the bench warrant was recalled and the matter set for pretrial hearing in December 1985. Petitioner appeared with Durham at the pretrial hearing and the case was set for a January 21 trial. Petitioner failed to appear on the date of trial, however. After the matter was called, Durham discussed his case with the deputy district attorney and entered into a plea bargain. Later in the morning, petitioner called the court to say that he would be unable to appear until the afternoon session. Durham informed the court that he had already worked out an agreement with the district attorney and had no further need of petitioner's services. Later, Durham wrote to petitioner requesting a refund of the $800 fee. Petitioner did not respond to the request or reimburse any of the fee.

The State Bar Court found that petitioner's call to the court on the day of trial was so tardy as to give Durham a reasonable belief that he had been abandoned; that his failure to appear at the pretrial hearing or to give reasonable notice that he would be late for trial was wilful; that Durham's discharge of petitioner was justified; and that petitioner was in substantial default in his performance and therefore had not earned any of the fee. By his conduct, the State Bar Court found that petitioner had wilfully violated rules 2-111(A)(3) and 6-101(A)(2) and sections 6068, 6103 and 6106.

### 4. *The Falk Matter*

In February 1984, Joanne Falk retained petitioner to represent her against a criminal charge of driving under the influence. Falk paid petitioner $400 to represent her in the matter.

Petitioner appeared with Falk at the arraignment and appeared on her behalf at several subsequent hearings. Petitioner failed to appear at a scheduled hearing in February 1985, however, and as a result a bench warrant

was issued for Falk's arrest. When Falk received notice of the warrant she contacted petitioner, who told her that a mistake had been made and that he would take care of it. After receiving a second notice, Falk again contacted petitioner, who again assured her that he would handle it.

Falk was subsequently stopped for speeding and, as a result of the outstanding warrant, was arrested and taken into custody. While in jail, Falk called petitioner's home and spoke with his wife. Petitioner, however, refused to take the call. After five hours in custody, Falk was able to obtain her release on $3,500 bail; she paid a $350 bail bond premium.

The following Monday, Falk contacted petitioner, who told her that there had been a mistake. Falk subsequently went to court to examine the file and discovered that the warrant had been issued because of petitioner's failure to appear at the scheduled hearing. She then retained another attorney to represent her. The new attorney wrote to petitioner requesting Falk's file. Petitioner failed to forward the file as requested.

The State Bar Court found that petitioner's assurances to Falk that the bench warrant had been a mistake constituted wilful misrepresentations and acts of moral turpitude, and that by his failure to take steps to recall the warrant he had wilfully abandoned his client. By his conduct, the State Bar Court concluded that petitioner wilfully violated rules 2-111(A)(2) and 6-101(A)(2) and sections 6068, 6103, and 6106.

### 5. *The Truitt Matter*

In February 1984, Dr. Robert Truitt retained petitioner to represent him against criminal charges of driving under the influence. Truitt paid petitioner $350 as an advance on attorney fees. Truitt understood from petitioner's representations that his personal appearances at several hearings in court would not be necessary and would be handled by petitioner. Petitioner appeared on Truitt's behalf at the arraignment and the matter was set for a pretrial hearing. Petitioner failed to appear at the pretrial hearing, however, and as a result a bench warrant was issued for Truitt's arrest. When Truitt received notice of the warrant he called petitioner, who stated that he did not understand why it was issued and would have the matter corrected.

Petitioner subsequently had the bench warrant recalled and a new pretrial hearing was scheduled. As a result of petitioner's failure to appear at the

rescheduled hearing, however, another bench warrant issued for Truitt's arrest.[10]

When Truitt learned of the new warrant, he called petitioner, who stated that it should not have been issued and that he would have the matter corrected. Later, after several unsuccessful attempts to contact petitioner, Truitt retained another attorney to handle the matter.

The State Bar Court found that petitioner committed acts of moral turpitude by misrepresenting to Truitt that he did not know why the warrants had issued; that he wilfully failed to perform the acts for which he had been retained and abandoned his client; that Truitt's discharge of petitioner and retention of another attorney was justified; and that petitioner did not earn any of the fees he had been paid in advance. By his conduct, the State Bar Court found that petitioner wilfully violated rule 6-101(A)(2) and sections 6068 and 6106.

### 6. *The Dunn Matter*

In January 1984, petitioner was retained by Kathleen Dunn to represent her in an action for personal injuries she suffered in an automobile accident. Petitioner advised Dunn that he intended to contact the insurance company and file a complaint, and that he would take care of all her medical bills through the insurance company. Dunn signed a medical release authorizing her physical therapy service to furnish petitioner with reports of all treatment incurred and directing petitioner to pay all medical bills due and owing.

Petitioner duly contacted the insurance company for the party who injured Dunn but thereafter failed to respond to any of the letters from the insurer requesting information necessary to evaluate Dunn's claim. Dunn spoke with petitioner on several occasions thereafter about late notices that she was receiving for unpaid medical bills, and he assured her he would take care of them. A subsequent credit check, however, revealed that one of the medical bills remained unpaid. Subsequent calls to petitioner went unreturned. Over the next several months, Dunn wrote petitioner three separate letters requesting information and assistance in clearing the negative report on her credit history, and reminding petitioner of the statute of limitations on her claim. Petitioner did not respond to any of the letters.

Petitioner did not file an action and the statute of limitations expired on Dunn's claim. Thereafter, Dunn retained another attorney who attempted

---

[10]Though the court file shows that petitioner was present at the rescheduled hearing, the State Bar Court found, on the basis of the evidence presented, that he did not appear.

to contact petitioner. His efforts were unsuccessful. Dunn's new attorney commenced an action against petitioner for malpractice and negligent and intentional infliction of emotional distress. Petitioner did not answer the complaint and a judgment was entered against him in the sum of $116,113. At the time of the hearing, with the exception of $93 garnished from petitioner's bank account, petitioner had not made any payments on the judgment.

The State Bar Court found that petitioner wilfully failed to perform the services for which he had been retained. By his conduct, the State Bar Court concluded that petitioner wilfully violated rule 6-101(A)(2) and sections 6068 and 6103.

### 7. *The James Matter*

In the late spring of 1984, William James met with petitioner seeking legal assistance in connection with a possible claim against Montgomery Ward resulting from James's detention by store employees on suspicion of shoplifting. Petitioner agreed to represent James on a contingency basis.

At a second meeting, petitioner had James sign a blank verification form and informed him that he would prepare and file a complaint on his behalf. Thereafter, however, James was unable to contact petitioner despite numerous attempts. Over a five-month period, James called petitioner and left messages on at least thirty occasions. Petitioner failed to return any of the calls. Finally, James wrote petitioner setting forth his repeated efforts to contact him and stating that he was notifying the State Bar of petitioner's conduct. Petitioner did not respond to this letter.

Petitioner admitted that he never filed an action on James's behalf. The State Bar Court found that petitioner wilfully failed to perform the services for which he had been retained, and that by his conduct he violated rule 6-101(A)(2) and sections 6068 and 6103.

### 8. *The Schumacher Matter*

In July 1981, Bruce Schumacher retained petitioner to represent him in a dispute with an insurance company over a property damage claim. During the next two years, Schumacher's numerous attempts to contact petitioner regarding the status of his case were generally unsuccessful. In July 1983, petitioner filed a complaint in the matter. He took no further action on Schumacher's behalf, however. In December 1986, Schumacher wrote petitioner requesting a copy of his file and advising him that he had filed a

complaint with the State Bar. Petitioner failed to provide the file as requested.

The State Bar Court found that petitioner wilfully abandoned Schumacher, wilfully refused to advise him as to the status of his case, and wilfully failed to take any action except to file the complaint. By his conduct, the State Bar Court concluded that petitioner violated former rule 6-101(2)[11] and sections 6068 and 6103.

9. *The Gilbert Matter*

In February 1983, Arthur and Rachael Gilbert retained petitioner to represent them in a matter involving a landslide onto property they owned in Santa Monica. At the time they retained petitioner, they expressed concern that the statute of limitations was about to run on their action. Petitioner filed a timely complaint to toll the statute and informed the Gilberts that he thought they had a viable action and was willing to represent them for a limited fee, with the balance to be paid on a contingency basis. In February, the Gilberts paid petitioner $500 as an advance on attorney fees and costs and in May they paid him an additional $500.

Thereafter, the Gilberts wrote petitioner requesting further information regarding attorney fees and the damages they might obtain in the action. Petitioner failed to respond. In September 1984, after waiting several months to hear from petitioner, the Gilberts phoned to inquire as to the status of their case. Petitioner failed to respond. Over the next several months, the Gilberts called petitioner's office several times requesting that he contact them, all without response.

In December 1984, the Gilberts wrote petitioner demanding the return of their $1,000 advance payment on fees and costs and directing that he turn their file over to another attorney whom they had retained. Petitioner failed to respond to this letter and failed to deliver the file to the other attorney. Though petitioner subsequently executed a substitution of attorney, he failed to turn over the entire file, withholding photographs, engineering reports and expert opinions.

The State Bar Court found that petitioner wilfully failed to communicate with his clients, wilfully failed to perform the services for which he had been retained, abandoned his clients, and failed to return any portion of the fees

---

[11] Former rule 6-101(2), prior to an amendment in 1985, provided that a member of the State Bar "shall not wilfully or habitually [¶] [f]ail to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning in an effort to accomplish, with reasonable speed, the purpose for which he is employed."

that had not been earned. By his conduct, the State Bar Court concluded that petitioner wilfully violated rules 2-111(A)(3) and 6-101(A)(2) and sections 6068 and 6103.

### 10. *The Beattie Matter*

In September 1984, Harold Beattie retained petitioner to represent him against criminal charges of driving under the influence. Beattie paid petitioner $300 in advance on an agreed upon fee of $450.

Petitioner agreed to appear on Beattie's behalf at a hearing in September. On the date in question, however, petitioner failed to appear. As a result, a bench warrant was issued for Beattie's arrest. Beattie later retained another attorney to represent him in the matter for a fee of $600, and wrote to petitioner demanding the return of the $300 he had advanced. Petitioner did not respond to the letter or return any portion of the fee. Beattie commenced an action in small claims court against petitioner and in January 1985, obtained a judgment for $300 plus costs. At the time of the disciplinary hearing in this matter, more than two years after the judgment, the judgment remained unsatisfied.

The State Bar Court found that petitioner wilfully abandoned his client and wilfully failed to perform the services for which he had been retained. By his conduct, the State Bar Court concluded that petitioner violated rule 6-101(A)(2) and sections 6068 and 6103.

### 11. *The Nevins Matter*

In October 1983, Charles Nevins retained petitioner to represent him in an unlawful detainer action against one of Nevins's tenants. Over the next year, petitioner represented to Nevins that he had provided the tenant with a three-day notice to pay rent or quit, had commenced an action, had been to court, had obtained a judgment and had contacted the marshal with regard to having the tenant removed. Except for the three-day notice, however, petitioner had, in fact, done none of these things. After several months, Nevins retained another attorney to handle the matter. Thereafter, Nevins brought an action against petitioner for the rent he lost as a result of petitioner's failure to act. Petitioner settled the matter for $4,000, to be paid at a rate of $400 per month commencing in January 1986. At the time of the hearing in this matter in November 1987, petitioner had failed to honor the terms of the settlement and still owed a balance of $3,500.

The State Bar Court found that, by his conduct, petitioner had wilfully violated rule 6-101(A)(2) and former rule 6-101(2), as well as sections 6068 and 6103.

### 12. *The Yonce Matter*

In June 1984, John and Esta Yonce retained petitioner to represent them in a civil action that had already been prepared by another attorney and was ready for trial. The Yonces paid petitioner $1,500 as an advance on attorney fees.

The day before trial, the matter settled. The settlement provided for the defendant to pay the Yonces $3,500 within two days and another $3,500 within ninety days. A dismissal with prejudice was to be sent to the defendant's attorney upon receipt of the first payment and, by implication, the second payment would be sent upon receipt of the dismissal. The Yonces received the first payment in June. By December, however, they had still not received the second payment. Numerous telephone calls to petitioner's office to inquire about the matter went unreturned. A letter sent by certified mail in December also failed to elicit a response, as did a follow-up letter in February 1985.

The Yonces, as a result, retained another attorney, Steven Gross, to assist in collecting the balance of the settlement. Gross made numerous telephone calls to petitioner's office and sent a substitution-of-attorney form requesting that it be signed by petitioner. Petitioner did not respond to any of the calls or the request for substitution of attorney. Gross thereupon filed a motion with the court to substitute himself for petitioner as the Yonces' attorney of record. The motion was granted. Gross then filed a dismissal of the Yonces' action and secured the remainder of the settlement.

The State Bar Court found that petitioner had abandoned his clients and wilfully failed to provide the services for which he had been retained. By his conduct, the State Bar Court concluded that petitioner violated rule 6-101(A)(2) and sections 6068 and 6103.

### 13. *The Hartman Matter*

In August 1983, Phillip Hartman retained petitioner to represent him in a civil matter involving a landslide onto property owned by Hartman in Santa Monica. Hartman paid petitioner $200 as an advance on costs. About a week after he had been paid, petitioner told Hartman that an action had been filed on his behalf. In fact, petitioner never filed any complaint in the matter.

About a year later, Hartman called petitioner's office several times leaving messages for petitioner to call back. The calls went unanswered. Eventually, Hartman retained another attorney to represent him in the matter. The

new attorney wrote several letters to petitioner requesting that he forward Hartman's file and return the $200 advanced for costs. Petitioner eventually forwarded a copy of Hartman's file, consisting of a draft of a complaint. He never returned any portion of the fee.

The State Bar Court found that petitioner abandoned Hartman and wilfully failed to perform the services for which he had been retained, wilfully made a false representation that he had filed a complaint knowing that the matter had not been filed, and wilfully failed to return the $200 advanced for costs. By his conduct, the State Bar Court concluded that petitioner wilfully violated rules 2-111(A)(3), 6-101(A)(2) and 8-101(B)(4),[12] former rule 6-101(2) and sections 6068, 6103 and 6106.

### The Matter of Petitioner's Criminal Conviction

We referred petitioner's conviction to the State Bar for its report and recommendation as to whether the offense involved moral turpitude. The State Bar Court found as follows: In January 1985, petitioner pleaded nolo contendere to a violation of Vehicle Code section 23152, subdivision (a) (driving under the influence of alcohol), with a prior conviction and a finding that one Dante Sefas suffered bodily injury as a result of petitioner's actions. Petitioner was placed on probation for three years upon terms which included: (1) three weekends in custody in a city jail, the specific jail and dates to be arranged by petitioner with the court by March 29, 1985; (2) payment of a fine by May 10, 1985; (3) restitution to the injured party by May 10, 1985; and (4) completion of a driving under the influence program by February 1986.

Petitioner failed to inform the court of his arrangements for custody. As a result, he was found to be in violation of probation and a bench warrant was issued for his arrest. Petitioner subsequently appeared in court, was given additional time to fulfill the conditions of probation, and presented proof of custody arrangements in June. Petitioner's check in payment of the fine was dishonored by his bank and he subsequently paid the fine in cash. Petitioner was seven months late in completing the drunk driving program.

The State Bar Court concluded that petitioner's act of driving under the influence with resultant injury to another person, when he had prior convictions of alcohol-related driving offenses, constituted an act of moral turpitude. The State Bar Court also concluded that petitioner's repeated acts of

---

[12] Rule 8-101(B)(4) provided that a member of the State Bar shall: "Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the member of the State Bar which the client is entitled to receive."

noncompliance with the terms of probation constituted misconduct warranting discipline.

In aggravation of petitioner's conduct, the hearing panel found (1) petitioner failed to cooperate with the State Bar in its investigation of the Katus, Durham, Dunn, Falk, Truitt, Sieg, Yonce and Hartman matters, by wilfully failing to respond to the State Bar inquiries; (2) petitioner failed to provide a copy of the complaint in the James matter although requested to do so; (3) in the State Bar's investigation of the Nevins matter, petitioner gave the State Bar investigator false information, claiming that he had filed the action but taken no further action after Nevins had failed to reimburse him for the filing fee when, in fact, he had not filed the complaint; (4) petitioner misled the State Bar in its investigation of the Gilbert matter; and (5) petitioner's misconduct was aggravated by the multiplicity of his acts.

In mitigation, the hearing panel found: (1) petitioner has no record of prior discipline, (2) he cooperated with the State Bar in its investigation of the Beattie matter, (3) his misconduct did not involve the misuse or misappropriation of trust funds, and (4) he possesses excellent legal skills.

### III.

Petitioner concedes that he is culpable of misconduct warranting discipline but contends that the discipline recommended by the department is excessive. He argues essentially that all of his misconduct was the result of certain extrinsic difficulties, including financial setbacks, his father's lingering illness and death, and the breakup of his marriage, which led in turn to his heavy drinking and the neglect of his practice. He contends that the hearing panel failed to properly consider and weigh these mitigating factors, as well as evidence of his efforts to rehabilitate himself, the absence of prior discipline, his community involvement, the fact that his misconduct did not involve the misuse or misappropriation of client funds, and his cooperation with the State Bar investigation. He also contends that the review department erroneously rejected the hearing panel's finding that his legal abilities constituted a significant mitigating factor.

■ We start from the premise that protection of the public and the bar, not punishment, is the primary purpose of attorney discipline and that we must accordingly consider all relevant mitigating and aggravating circumstances. (*Hipolito* v. *State Bar* (1989) 48 Cal.3d 621, 626 [257 Cal.Rptr. 331, 770 P.2d 743].) "In our consideration of the nature of a disciplinary offense we are not insensitive to the personal and professional problems that frequently besiege the practitioner . . . ." (*Tenner* v. *State Bar* (1980) 28 Cal.3d 202, 207 [168 Cal.Rptr. 333, 617 P.2d 486].) In some cases, personal

problems may legitimately explain a period of inattention to one's law practice; in others, however, they may merely provide a convenient excuse. This case, sad to say, appears to fall in the latter category.

■ The hearing panel in this proceeding duly considered and rejected as lacking in credibility much of the evidence presented by petitioner in mitigation. While we independently examine the record, these findings are entitled to substantial weight. (*Gallagher* v. *State Bar* (1981) 28 Cal.3d 832, 838 [171 Cal.Rptr. 325, 622 P.2d 421].) It is petitioner's burden to demonstrate that they are erroneous. (*Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 736 [187 Cal.Rptr. 30, 653 P.2d 321].) Petitioner has failed to carry his burden in this regard.

As to petitioner's asserted financial difficulties stemming from his separation from the Culver City law firm (petitioner claims to have lost a $2,000 monthly salary), the hearing panel justifiably observed that petitioner's breakup with the firm was hardly likely to induce him to abandon clients at a time when he most needed them. The panel was also not persuaded that the illness and death of petitioner's father affected his practice, noting that there was no evidence his father's condition occupied any significant portion of petitioner's time and attention.[13] The panel further observed that petitioner's alcohol problem predated both his separation from the firm and his father's death; indeed, petitioner's alcohol-related driving offenses date from 1975, four years before his admission to the bar.

As to petitioner's claim that the breakup of his marriage detracted from his professional responsibilities, the panel noted that petitioner had abandoned clients Gilbert, Hartman, Nevins, Dunn and Schumacher before he was even married, and went on to abandon Yonce, Truitt, James and Beattie while the marriage was, by his own admission, still healthy.

Nor was the panel overly impressed with petitioner's evidence of community service, consisting primarily of his membership in the local chamber of commerce, board of realtors, Elks and Jaycees, and his efforts to revive the Culver City Bar Association. The record amply supports the panel's conclusion that petitioner's participation in these groups did not present clear and convincing evidence of public service as a mitigating factor.[14]

[13] The hearing panel also observed that there was no evidence of a "close relationship" between petitioner and his father. Petitioner properly points out that, regardless of how "close" a relationship may be in later life, the illness and death of a parent may be significantly unsettling. However, there was little or no evidence that such was the case here.

[14] The panel may have slightly overstated the case in characterizing petitioner's activities in these groups as "primarily centered on partying . . . ." However, there was little or no evidence that petitioner's involvement was primarily centered on public service.

The record also shows that petitioner's character witnesses—including two municipal court judges, a court commissioner and several attorneys—while professing respect for petitioner's skills as an attorney, conceded that petitioner frequently missed court appearances and had a reputation for alcohol abuse. None testified affirmatively as to defendant's moral character. The hearing panel also noted that none of the witnesses had observed petitioner recently and therefore could not speak to the question of his rehabilitation and current fitness to practice.

As presented in his brief and emphasized at oral argument, petitioner's claim of excessive discipline rests primarily on the assertion that he went through a period of extreme alcohol abuse but was now thoroughly rehabilitated. However, the record amply supports the hearing panel's rejection of rehabilitation as a mitigating factor. Petitioner testified that he had been arrested for alcohol-related driving offenses in 1975, 1980, 1985 and 1987. The 1980 and 1985 arrests resulted in convictions (the 1987 arrest was pending at the time of the disciplinary hearing). Petitioner also acknowledged that he had developed a pattern of drinking when under stress.

Petitioner's evidence of "rehabilitation" consisted of the declarations and testimony of the president of a substance abuse program to which petitioner had twice been referred by the municipal court for his drunk driving convictions in 1980 and 1985, and two persons who counselled petitioner in the program. While all three testified that petitioner had made progress with his drinking problem while in the program, none had specific knowledge about petitioner's drinking since his completion of the program in September 1986. Petitioner claimed to have stopped drinking in September 1987, the month before the disciplinary hearing, so as not to "cloud any thoughts . . ." at the time of the hearing. Petitioner gave no indication, however, that he was currently enrolled in any ongoing substance abuse program at the time of the hearing.

■ While we have recognized in the context of disciplinary proceedings the "all too frequent devastating impact of alcohol abuse" (*Tenner, supra,* 28 Cal.3d at p. 207), "[i]n the absence of reliable evidence that a 'long-standing addiction is permanently under control' (*Gary* v. *State Bar* (1988) 44 Cal.3d 820, 828 [244 Cal.Rptr. 482, 749 P.2d 1336]), or demonstration of 'a meaningful and *sustained* period of successful rehabilitation' (*Rosenthal* v. *State Bar, supra,* 43 Cal.3d at p. 664, italics added [18 months of sobriety insufficient to demonstrate control of addiction]), we have not found incomplete or short-term efforts at rehabilitation sufficiently compelling to warrant reducing the severity of disciplinary sanctions recommended by the State Bar Court." (*Twohy* v. *State Bar* (1989) 48 Cal.3d 502, 515 [256 Cal.Rptr. 794, 769 P.2d 976].) Here, in light of petitioner's pattern of drunk

driving arrests, including an arrest only seven months before the disciplinary hearing, the absence of any evidence of long-term rehabilitation, and his lack of participation in any ongoing substance abuse program, we are unable to conclude, on this record, that petitioner has demonstrated a successful and sustained rehabilitation sufficient to mitigate the recommended discipline.

■ Lastly, petitioner contends that the review department improperly deleted the hearing panel's finding that his "legal abilities" constituted a significant mitigating factor in favor of suspension rather than disbarment.[15] In view of petitioner's multiple acts of wrongdoing, the clear pattern of client neglect and abandonment, and the lack of any evidence of meaningful, long-term rehabilitation, we are inclined to agree with the department's rejection of petitioner's legal aptitude as a relevant factor in mitigation.

The hearing panel considered as factors in mitigation the absence of a prior disciplinary record, the fact that petitioner's misconduct did not involve the misappropriation of client funds, and petitioner's cooperation with the State Bar in its investigation of the matter. ■ The absence of a prior disciplinary record, however, is not in our view entitled to substantial weight. Petitioner had been in practice only two years before the first of the thirteen separate disciplinary matters commenced, and continued for several years thereafter. Thus, petitioner's lack of prior disciplinary record is not a significant mitigating factor. (*Kelly* v. *State Bar* (1988) 45 Cal.3d 649, 658 [247 Cal.Rptr. 608, 754 P.2d 1104]; *Hitchcock* v. *State Bar* (1989) 48 Cal.3d 690, 708 [257 Cal.Rptr. 696, 771 P.2d 394].)

Petitioner's cooperation with the bar in the Beattie matter does not constitute a significant mitigating factor, particularly in light of petitioner's failure to cooperate with the bar in the majority of the remaining matters.

Finally, we are not persuaded that petitioner's misconduct is significantly mitigated by the fact that his actions did not involve the misappropriation of client funds. The clients whom he misled, ignored and abandoned suffered substantial injury in other respects. In the Falk matter, for example, his client was taken into custody and required to post a $3,500 bail. In the Dunn case, his actions allowed the statute of limitations to bar his client's cause of action. In the Nevins case, his inaction resulted in the nonpayment to his client of six months' rent.

■ "Habitual disregard by an attorney of the interests of clients is ground for disbarment under Business and Professions Code section 6103

---

[15] The hearing panel's finding stated: "202. This Panel has carefully weighed disbarment and the alternative, a lengthy period of actual suspension. If it were not for [petitioner's] legal abilities and standard 1.4(c)(ii) this Panel would recommend disbarment."

and 6106. Even when such neglect is grossly negligent or careless, rather than willful and dishonest, it is an act of moral turpitude and professional misconduct, justifying disbarment. . . ." (*Farnham* v. *State Bar* (1988) 47 Cal.3d 429, 446 [253 Cal.Rptr. 249, 763 P.2d 1339], quoting *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352], quoting *Grove* v. *State Bar* (1967) 66 Cal.2d 680, 683-684 [58 Cal.Rptr. 564, 427 P.2d 164], internal quotation marks deleted.) The record here shows that petitioner failed to perform the services for which he was hired in 13 separate cases. In the Katus, Dunn, James, Nevins and Hartman matters, he failed to file complaints on behalf of clients. In the Durham, Falk, Truitt and Beattie matters, he failed to appear at scheduled hearings with the result that bench warrants were issued for his clients' arrest.

In the Yonce matter, he failed to file the required dismissal and obtain the second installment of his clients' settlement. In the Schumacher matter, he filed an action and failed to serve or provide the court with proof of service within the statutory period. In the Gilbert matter, he failed to amend the complaint and proceed with discovery for over a year and a half after the initial complaint was filed. In the Sieg matter, he failed to take any meaningful steps to assist his client in resolving her landlord/tenant dispute.

In all of the foregoing cases with the exception of the Nevins matter, petitioner failed to communicate with his clients, failed to return calls, failed to respond to letters or to respond to inquiries concerning the status of his clients' cases. The evidence further shows that in four matters (Katus, Falk, Truitt and Hartman) petitioner made misrepresentations to his clients, and in at least seven matters (Katus, Durham, Gilbert, Hartman, Truitt, Beattie and Yonce) he failed to return unearned fees.

Though not binding on this court (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]), the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V) make clear that a pattern of misconduct of the type presented here shall normally result in disbarment. Standard 2.4(a) provides: "Culpability of a member of a pattern of wilfully failing to perform services demonstrating the member's abandonment of the causes in which he or she was retained shall result in disbarment."

The evidence in mitigation presented by petitioner in this matter was extremely modest, while that in favor of aggravation (multiple acts of abandonment and misrepresentation, significant harm to clients, and lack of cooperation with the State Bar investigation) was substantial. Furthermore, the most important potential evidence in favor of mitigation—proof of a sustained period of sobriety—was conspicuously absent. We cannot

conclude, therefore, that the purpose of protecting the public and the bar would be better served if a lesser degree of discipline than that recommended by the review department were imposed.

Accordingly, it is ordered that petitioner Kevin Chase Coombs be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is further ordered that petitioner be ordered to comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)